**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| SAMUEL LIT, | ) | |
| | ) | |
| | ) | Case No. 1:16-cv-07054 |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Hon. James B. Zagel, presiding |
| | ) | |
| | ) | |
| ZAZZLE INC., | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |

## OPPOSITION TO MOTION TO DISMISS

Samuel Lit built a system that marries the forward-facing websites that users see and interact with and the "back office" servers that deliver and display the content. The system Lit built is thoroughly described in U.S. Patent No. 8,793,330 (hereinafter, the "'330 patent"). Indeed, Lit shares the exact datafiles that constitute the software engines that enable instantaneous delivery and display of content. Moreover, Lit's patent claims themselves teach the ordered combination of elements that one needs to achieve "real time" delivery and display of content over the Internet.

In other words, Lit improved on the prior art systems that yielded only static delivery and display of content. As such, under Federal Circuit law—which Zazzle neglects to cite—the '330 patent is valid under 35 U.S.C. § 101.

## Standard of Review

The familiar standard of review on a motion to dismiss like Zazzle's: "Factual allegations must be enough to raise a right to relief above the speculative level . . . on the assumption that all of the allegations in the complaint are true (even if doubtful in fact) . . . ." *Bell Atlantic Corp. v.*

*Twombly*, 550 U.S. 544, 555-56 (2007); *see also Tierney v. Advocate Health and Hospitals Corp.*, 797 F.3d 449, 451 (7th Cir. 2015) ("We accept the plaintiffs' well-pled facts as true and construe reasonable inferences in their favor.").

Furthermore, Lit attached the '330 patent to the complaint. (Dkt. 1 (Compl.) ¶ 7.) Therefore, the patent claim language and written description are part and parcel of the complaint itself and comprise the well-pled facts outlined below. *See* Fed. R. Civ. P. 10 (c) ("A copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes.").

### Well-Pled Facts

1. The '330 patent improves the delivery and display of data over computer networks. (Dkt. 1, Ex. A, col. 1:15-19 ("[T]he invention relates to a digital media application platform and method which *dynamically* delivers and displays content via computerized systems and internet websites in real time.") (emphasis added). The '330 patent is an improvement patent, described as follows:

> [A]dvertising on the internet has been relegated to a few common methods such as, for example, relatively static banner advertisements and so-called "framing" of advertisements wherein static advertisements appear in a frame around a website's active window.
>
> Accordingly, there exists a need for an improved system and method for disseminating information and particularly advertising, over the internet in a rapid yet cost effective manner. There is further need for improved systems which utilize minimal computing capacity or while maximizing the available space for content which is visible to the user of an internet website or other computing display window.

(*Id.*, col. 1:31-43.) Stated generally, the '330 patent transforms content delivery over the Internet from a static to a dynamic process. (*Id.*)

2.        Figure 1 of the '330 patent is the Display Carousel System. That system includes the server, which the specification describes in detail as follows: "Server **2000** comprises database **2100** in communication with banner image storage **2200**, where images may be stored, image processing engine **2300**, where images may be processed, and server side display engine **2400** which may receive and deliver images to client web browser **3000**. Database **2100** may comprise data storage and retrieval functionality including user accounts **2110**, banner records **2120**, and click statistics **2130**. In addition, server **2000** may deliver Display Carousel System **1000** platform applications wherever they may be directed, such as, for example, on websites, in e-mails, attached to pictures, affixed to media players, etc." (Dkt. 1, Ex. A, col. 4:29-41.) Note the two-way functionality of the server side display engine **2400**, for example, which allows for "cross pollination" in the system described below.

3.        The system includes "forward-facing" elements that a user would interact with. "Client web browser **3000** may comprise client side display engine **3100** which may pass the image to be displayed to remote website **4000**. Remote website **4000** comprises embedded hypertext **4100** which may permit viewing of the image displayed on the Display Carousel which appears at remote website **4000**." (Dkt. 1, Ex. A, col. 4:44-49.)

4.        As is repeatedly described in the written description, this is a cohesive system with modules that dynamically work together to deliver and display content in real time:

> System **1000** permits the cross pollination of data between, and allows for seamless navigation across, all system **1000** platforms including server **2000**, client web browsers **3000**, remote websites **4000** and websites all destination platforms. Data from server **2000**, including images, text, video, and other content, as well as account, record and other statistical and financial information, may be passed to client web browser **3000**; and then passed from client web browser **3000** to remote website **4000**. Data may also be passed from remote website **4000** to client web browser **3000**; and then from client web browser **3000** to

3

server **2000**. In addition, in some configurations, certain data may
also be passed directly from server **2000** to remote website **4000**.

(Dkt. 1, Ex. A, col. 4:44-49.)

5.      This "cross pollination" is the novel function that takes content delivery and display from static to dynamic—and Lit described exactly how he did this: "The system of this invention www.YourDisplayCarousel.com is a series of sophisticated software engines. The unique organic nature of these engines are specifically designed to cross pollinate data, information processing, instructions, execution, and delivery of a multitude of features and multimedia simultaneously and seamlessly, from the client side to the user side to the destination location of the requested systematic function, instantly." (Dkt. 1, Ex. A, col. 5:32-40.)

6.      Lit not only described each of the engines of the preferred embodiment, he went further and shared each of the datafiles corresponding to the different engine of the preferred embodiment: "Generally, each of the datafiles may represent and support the administration application functions which are present in the system database. The datafiles are the engines that tie users to their accounts, host locations while providing executive display access and delivery oversight and control. Each of the datafiles utilized in the embodiment depicted in FIG. 2 are described below." (Dkt. 1, Ex. A, col. 5:47-53.)

7.      Lit describes ten datafiles (i.e., software engines) and shares the data set corresponding to each engine as a Figure. The descriptions of the functions Figures 3 and 9 perform are illustrative:

- "FIG. 3 depicts the 'adminusers' datafile. The 'adminusers' datafile is an access portal engine and datafile for account access to Executive and other functionality. The Executive function provides administration and oversight of all system user accounts, activities, revenues and transfers, statistical values, real time monitoring of networks, all network activity, global/geographic delivery options, and sub navigation control of all functions. Other functionality also includes local account administration

navigation for all Subscribers, Advertisers, active and host account system administration." (Dkt. 1, Ex. A, col. 5:60-67.)

- "FIG. 9 depicts the 'mediauploads' datafile. The 'mediauploads' datafile is an upload function engine and datafile in all accounts to the storage engines for on demand delivery where applicable and selected by any subscriber, host, users or platform administrator." (*Id.*, col. 6:26-30.)

8.       The claim language of the '330 patent focuses on bringing dynamic delivery and display of content to the Internet. For example, claim 1 is "[a] system for displaying content in real time . . . ." (Dkt. 1, Ex. A, col. 5:60-67.) "Real time" is defined in the computer network arts as "input data processed within milliseconds or microseconds." *See, e.g.,* en.wikipedia.org/wiki/Real-time_computing. Claim 1 includes the cohesive "client-side" and "server-side" modules to bring about real time display and delivery as claimed:

a.       "a display carousel integrated into a website or webpage accessible over the Internet and comprising embedded hypertext [**Fig. 1, 4100 and 3100**], said display carousel comprising: one or more display windows configured to display said content dynamically delivered to said display windows by a display engine [**2400**] in communication with a server of said system or by an upload gateway on said website or webpage [**col. 3:38-39**] . . . ." (*Id.*, col. 10:5-11.)

b.       "a processor coupled to a memory [**Fig. 1, 2300**], said processor processes said content stored in said system for said display engine . . . ." (*Id.*, col. 10:11-12.)

c.       "a client portal or said one or more third party remote portals that displays said display carousel with said website or webpage, wherein said content is instantly passed between said display engine and said display carousel and displayed on said display carousel with said client portal or one or more third party remote portals, wherein said display windows of said display carousel are configured to revolve at a predetermined rate of speed when said

website or webpage is displayed on said client portal or one or more third party remote portals." (*Id.*, col. 10:12-22.)

9.    Claim 16 specifies the two-way function of the database that both stores and retrieves data so that the user of the system may collect important data regarding, for example, how often an advertisement is viewed or how often the ad results in a purchase: "a database comprising storage and retrieval functionality for statistical and financial information about said content displayed on said display carousel, wherein said database is in communication with said server . . . ." (Dkt. 1, Ex. A, col. 11:8-11.)

## Argument

**I.     The '330 patent claims patentable subject matter because the patent improves on techniques for delivery and display of content over the Internet and also solves the problem of static delivery and display with the inventive concept of blending the client- and server-sides.**

"A patent may be obtained for 'any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof." *BASCOM Global Internet Servs., Inc. v. AT&T Mobility LLC*, 827 F.3d 1341, 1347 (Fed. Cir. 2016) (quoting 35 U.S.C. § 101). The Supreme Court long ago held that the statute contains an important exception: laws of nature, natural phenomena, and abstract ideas are not patentable: "[M]onopolization of those tools through the grant of a patent might tend to impede innovation more than it would tend to promote it." *Mayo Collaborative Servs. v. Prometheus Labs., Inc.*, 132 S. Ct. 1289, 1293 (2012).

In *Mayo*, the Court held that a two-part test identifies patents that claim nothing more than a patent-ineligible concept like an abstract idea. First, the Court should "determine whether the claims are directed to one of those patent-ineligible concepts [i.e., natural phenomena, law of nature, or abstract idea]." *Alice Corp. Pty., Ltd. v. CLS Bank Int'l*, 134 S. Ct. 2347, 2355 (2014) (citing *Mayo*, 132 S. Ct. at 1296-97).

6

If the Court concludes that the claim is directed to an abstract idea, for example, then the Court should ask, "[w]hat else is there in the claims before us?" *Id.* (quoting *Mayo*, 132 S. Ct. at 1297) (internal quotations omitted). "To answer that question, we consider the elements of each claim both individually and 'as an ordered combination' to determine whether the additional elements 'transform the nature of the claim' into a patent-eligible application." *Id.* (quoting *Mayo*, 132 S. Ct. at 1297-98). "We have described step two of this analysis as a search for an 'inventive concept'—*i.e.*, an element or combination of elements that is 'sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the [ineligible concept] itself.'" *Id.* (quoting *Mayo*, 132 S. Ct. at 1294).

## A.    The '330 patent clears step one of the *Mayo* test.

The '330 patent claims are directed to improving the display and delivery of content over the Internet through a dynamic joining of the client- and server-sides of a computer network. (*See, e.g.*, Dkt. 1, Ex. A, col. 10:15-18 ("wherein said content is *instantly passed* between said display engine and said display carousel and displayed on said display carousel with said client portal or one or more third party remote portals . . . .") (emphasis added).) This is not an abstract idea because Mr. Lit concretely claimed the dynamic system and told the public exactly how to build the system in the specification.

The '330 patent claims are directed to an improvement in computer technology like those upheld in *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327 (Fed. Cir. 2016). In that case, the court of appeals reversed the district court's grant of summary judgment for the defendant and held that the patent claims were eligible under § 101.

The Federal Circuit noted that the district court had concluded that the claims were directed to "'storing, organizing, and retrieving memory in a logical table' . . . ." *Id.* at 1337. The

appeals court admonished such a general characterization: "[D]escribing the claims at such a high level of abstraction and untethered from the language of the claims all but ensures that the exceptions to § 101 swallow the rule." *Id.*[1] The court of appeals examined the claim language and held, "[T]he claims are not simply directed to *any* form of storing tabular data, but instead are specifically directed to a *self-referential* table for a computer database." *Id.* (emphasis in original). The Federal Circuit held that the claim language was directed to an improvement in the computer arts: "the claimed invention achieves other benefits over conventional databases, such as increased flexibility, faster search times, and smaller memory requirements." *Id.*

Here, Lit claims a cohesive system that includes a client-side (e.g., a website) and a server-side. (*See, e.g.*, Dkt. 1, Ex. A, col. 10:5 ("a display carousel integrated into a website"); *id.*, col. 10:9-10 ("a display engine in communication with a server of said system . . . .); *id.*, col. 10:15-17 ("wherein said content is instantly passed between said display engine and said display carousel . . . ."). The bridging of these two sides allows for dynamic rather than static delivery and display of content over the Internet: "The unique organic nature of these engines are specifically designed to cross pollinate data, information processing, instructions, execution, and delivery of a multitude of features and multimedia simultaneously and seamlessly, from the client side to the user side to the destination location of the requested systematic function, instantly." (Dkt. 1, Ex. A, col. 5:32-40.)

Zazzle is simply wrong that "[a]ll claim 16 is 'trying to achieve' is the conventional idea of displaying information on a website." (Br. at 8.) To make this assertion, Zazzle must ignore

---

[1] As *Enfish* holds, the claim language is paramount in the § 101 analysis. Zazzle's argument to the contrary, which does not even find support in the lower court precedent relied on, should be rejected: "The Court must look past the claim language to the purpose of the claim to determine what the invention is trying to achieve." (Br. at 8 (citing *Morales v. Square, Inc.*, 75 F.Supp.3d 716, 724 (W.D. Tex. 2014).)

claim 16's language, such as "wherein said content is instantly passed between said display engine and said display carousel when said display carousel is displayed with said website or webpage on said web browser." (Dkt. 1, Ex. A, col. 11:11-14.) The '330 patent is directed towards linking the client side and server side to allow for dynamic delivery and display—which the patent office considered an improvement on the prior art when the patent office issued the patent.

Zazzle is also wrong in arguing, "The mechanism for this display engine is not described." (Br. at 8.) The specification teaches a "server side display engine **2400** which may receive and deliver images to client web browser **3000** . . . ." (Dkt. 1, Ex. A, col. 4:33-35.) Further, the specification describes the datafiles that comprise the display engine and includes the datafile itself as a Figure. For example, "FIG. 9 depicts the 'mediauploads' datafile. The 'mediauploads' datafile is an upload function engine and datafile in all accounts to the storage engines for on demand delivery where applicable and selected by any subscriber, host, users or platform administrator." (*Id.*, col. 6:26-30.)

As discussed, the claims are directed to improving the delivery and display of content by "cross pollinating" the client and server sides and Mr. Lit teaches exactly how to build the datafiles in order to achieve this result. Therefore, this case is unlike *In re TLI Commn'cns LLC Patent Litig.*, 823 F.3d 607 (Fed. Cir. 2016), where "the server is described simply in terms of performing generic computing functions such as storing, receiving, and extracting data." *Id.* at 612. In contrast, Lit does not claim a generic server alone, but rather a server that acts as one component in the cohesive whole that allows for dynamic delivery and display of content: "System **1000** permits the cross pollination of data between, and allows for seamless navigation

across, all system **1000** platforms including server **2000**, client web browsers **3000**, remote websites **4000** and websites all destination platforms." (Dkt. 1, Ex. A, col. 4:50-54.)

       **B.**    **Even if the Court holds that the '330 patent is directed to an abstract idea, the patent would still be eligible for protection because the claims are to the inventive concept of marrying the client and server sides to deliver and display dynamically as an improvement over the prior art.**

Samuel Lit identified a problem rooted in computer technology—in the prior art content was delivered and displayed in static form: "[A]dvertising on the internet has been relegated to a few common methods such as, for example, relatively static banner advertisements and so-called 'framing' of advertisements wherein static advertisements appear in a frame around a website's active window." (Dkt. 1 (Ex. A), col. 1:31-35.) Lit's invention claimed in the '330 patent is addressed to resolving this problem by making a cohesive system where the client side and server side instantly transmit content back and forth so that the content may be instantly delivered to the user: "wherein said content is *instantly passed* between said display engine and said display carousel and displayed on said display carousel with said client portal or one or more third party remote portals . . . ." (*Id.*, col. 10:15-18 (emphasis added).)

This case is similar to *BASCOM*, 827 F.3d at 1350, where the court of appeals vacated the district court's grant of a motion to dismiss based on § 101. The patent-in –suit there claimed a tool that could filter content that an end user would receive on his computer. *Id.* Unlike the prior art filtering systems, this system installed the filtering tool at a remote location (i.e., server) rather than on the end user's computer. *Id.* The Federal Circuit recognized that the plaintiff did not invent the elements that made up the claim: "local computers, ISP servers, networks, network accounts, or filtering. Nor does the specification describe those elements as inventive." *Id.* at 1349. The appeals court held that the "inventive concept can be found in the non-conventional and non-generic arrangement of known, conventional pieces." *Id.* at 1350.

The same could be held here. Lit does not purport to have invented servers, databases, websites, or any of the other generic computing components that he used to build his system. Instead, Lit invented a unique arrangement of these known elements that produces the novel result of instantaneous (real time) delivery and display of content over the Internet. The unique arrangement of the elements is evidenced in the datafiles that Lit describes in the specification (cols. 5:32-6:38) and attaches as Figures 2 through 11. Moreover, the unique arrangement of elements is evidenced and taught in the claims. (*See, e.g.*, Dkt. 1, Ex. A, col. 10:15-18 ("wherein said content is *instantly passed* between said display engine and said display carousel and displayed on said display carousel with said client portal or one or more third party remote portals . . . .") (emphasis added).)

The '330 patent is "necessarily rooted in computer technology in order to overcome a problem specifically arising in the realm of computer networks." *DDR Holdings, LLC v. Hotels.com Ltd. P'ship*, 773 F.3d 1245, 1257 (Fed. Cir. 2014). Indeed, as in *DDR*, where the claims involved a method of retaining visitors to a website by creating other websites with the "look and feel" of the original website, *id.* at 1257-58, here the claims solve the problem of static delivery and display of website content. The solution is taught as "a series of sophisticated software engines . . . specifically designed to cross pollinate data, information processing . . . simultaneously and seamlessly, from the client side to the user side to the destination location of the requested systematic function instantly." (Dkt. 1, Ex. A, col. 5:33-40.)

Mr. Lit explains exactly how his system achieves instantaneous delivery and display. (*See supra* at 4-6.) This case is therefore different than *Internet Patents Corp. v. Active Network, Inc.*, 790 F.3d 1343 (Fed. Cir. 2015), where the court of appeals affirmed the grant of a motion to dismiss based on § 101. There, neither the claims nor the written description taught how to

achieve the purported essential innovation—maintaining data in online forms. *Id.* at 1348. As discussed above, Mr. Lit teaches how to achieve instantaneous delivery and display of content in the specification and claims. (*See supra* at 4-6.)

Mr. Lit also improved on the prior art, so that the dynamic delivery and display of content could be used for new things like tracking in real time how many times an advertisement leads to a sale: "a database comprising storage and retrieval functionality for statistical and financial information about said content displayed on said display carousel, wherein said database is in communication with said server . . . ." (*See, e.g.*, Dkt. 1, Ex. A, col. 11:8-11.) This case is thus distinguished from *Intellectual Ventures I, LLC v. Capital One Bank (USA)*, 792 F.3d 1363, 1370 (Fed. Cir. 2015), where the claims simply tailored advertising based on pre-determined inputs about a user—a technique long used in television.

As discussed above, Lit describes how to build the system that yields the desired result of instantaneous delivery and display of content. (*See supra* at 4-6.) As such, Zazzle misplaces reliance on *Bancorp Serv., L.L.C. v. Sun Life Assurance Co. of Canada (U.S.)*, 687 F.3d 1266, 1278 (Fed. Cir. 2012), where the claims used a computer "only for its most basic function, performance of repetitive calculations, and as such does not impose meaningful limits on the scope of those claims." Similarly, *Tuxis Tech., LLC v. Amazon.com, Inc.*, No. 13-1771, 2014 WL 4382446 (D. Del. Sept. 3, 2014), has no application here. In that case, the claims covered a method where a computer was used to "up-sell" product to a consumer—a practice performed since markets were developed. *Id.* at *5. The computer did not provide a meaningful limitation because the computer was not integral to the claim—which cannot be said here.

## Conclusion

Samuel Lit respectfully requests that the Court enter an order denying the motion to dismiss.

Date: <u>October 18, 2016</u>           <u>/s/ Matthew M. Wawrzyn</u>

                                          Matthew M. Wawrzyn (#6276135)
                                          matt@wawrzynlaw.com
                                          Stephen C. Jarvis (#6309321)
                                          stephen@wawrzynlaw.com
                                          WAWRZYN & JARVIS LLC
                                          233 S. Wacker Dr., 84th Floor
                                          Chicago, IL 60606
                                          (312) 283-8010

                                          *Counsel for Samuel Lit*

<u>**CERTIFICATE OF SERVICE**</u>

The undersigned, an attorney, hereby certifies that on October 18, 2016 a true and correct copy of the foregoing **Opposition to Motion to Dismiss** was filed electronically with the Clerk of the Court using the CM/ECF system, thereby serving all counsel of record.


*/s/ Matthew M. Wawrzyn*